**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **STEPHEN YNOSTROSA,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **vs.** | § | |
| | § | **CIVIL NO. SA-5:19-cv-01037** |
| **RANDOLPH-BROOKS FEDERAL** | § | |
| **CREDIT UNION, BLAKE LYONS and** | § | |
| **ASHLEY INGLE,** | § | |
| *Defendants.* | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

**TO THE HONORABLE JUDGE OF SAID COURT:**

1.      Plaintiff Stephen Ynostrosa files this Original Complaint against Defendants Randolph-Brooks Federal Credit Union ("RB"), Blake Lyons ("Lyons") and Ashley Ingle ("Ingle") (the foregoing collectively being referred to as the "Defendants") to recover all damages to which Ynostrosa shows himself entitled at law or in equity.

## SUMMARY OF CLAIMS

2.      Ynostrosa brings this action to seek reinstatement and other remedies available to him under the Family and Medical Leave Act ("FMLA") and Americans with Disabilities Act ("ADA").  He reserves the right to bring such other claims that may be supportable at discovery progresses in this case, including, for instance, claims under the Texas Commission on Human Rights Act given that he dual-filed his predicate charge of discrimination with the Equal Employment Opportunity Commission, complaining of disability discrimination and retaliation.

## JURISDICTION & VENUE

3.      This Court has jurisdiction under 28 U.S.C. § 1331 (federal question).  In addition, under 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over any and all state claims if they are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy.

4.      This Court is the proper venue under 28 U.S.C. § 1391.  Plaintiff's claims arose in whole or in part in and around San Antonio, Texas, where he was jointly employed and/or controlled and/or suffered or permitted to work by one or more of the Defendants.

5.      As of the time of filing, the damages and other relief sought are within the jurisdictional limits of the Court.

## PARTIES

6.      Plaintiff Stephen Ynostrosa is an individual residing in Bexar County, Texas, within the Western District of Texas, San Antonio Division.  He may be served through his undersigned counsel.

7.      Defendant Randolph-Brooks Federal Credit Union ("RB") is a federal credit union. According to the Texas Secretary of State's official online records RB may be served through its registered agent as follows:

Randolph-Brooks Federal Credit Union
*care of its registered agent*
Corporation Service Company dba
CSC-Lawyers Incorporating Service Company
211 E. 7th Street, Suite 620
Austin, Texas 78701-3218 USA

8.      Defendant Blake Lyons is an individual who is liable as to the FMLA claims asserted by Ynostrosa (but not as to the separately pled disability discrimination/retaliation claims).  He may be

served wherever he may be found; however, it is believed that he regularly offices at RB's headquarters and so should be served as follows:

Blake Lyons
Vice-President of Marketing & Business Development
Randolph-Brooks Federal Credit Union
1 Randolph Brooks Parkway
San Antonio, Texas 78233

9.     Defendant Ashley Ingle is an individual who is liable as to the FMLA claims asserted by Ynostrosa (but not as to the separately pled disability discrimination/retaliation claims).  She may be served wherever she may be found; however, it is believed that she regularly offices at RB's headquarters and so should be served as follows:

Ashley Ingle
Vice-President of Marketing & Business Development
Randolph-Brooks Federal Credit Union
1 Randolph Brooks Parkway
San Antonio, Texas 78233

10.     At all relevant times of claims of discrimination and retaliation, RB employed over 500 employees.

## MISNOMER/MISIDENTIFICATION

11.     In the event any parties are misnamed or are not included herein, it is Ynostrosa's contention that such was a "misidentification," "misnomer" and/or such parties are/were "alter egos" of parties named herein. Alternatively, Ynostrosa contends that such "corporate veils" should be pierced to hold such parties properly included in the interest of justice.

## *RESPONDEAT SUPERIOR*

12.     Employees involved in this cause of action were, at all times described herein, employees and agents of Defendant and were at all times acting in the course and scope of that employment. Accordingly, Defendant RB is liable for such conduct under the doctrine of r*espondeat superior*.

## PLAINTIFF EXHAUSTED ADMINISTRATIVE REMEDIES

13.     Ynostrosa exhausted his administrative remedies as to his claims under the Americans with Disabilities Act of 1990 and ADA Amendments Act of 2008 (collectively referred to as "ADA").

14.     On or about February 22, 2019, Ynostrosa filed the attached predicate charge with the EEOC, which is incorporated by reference herein as if set forth *verbatim*.  *See* Ex. 1, 20190222 Ynostrosa Charge.

15.     On June 4, 2019, the EEOC mailed Ynostrosa a Dismissal and Notice of Rights care of his undersigned attorney, which the EEOC signed on May 31, 2019.  *See* Ex. 2, 20190531 EEOC Right to Sue Ltr.

## FACTS RELEVANT TO ALL CLAIMS

16.     In January 2005, Ynostrosa started working for RB.  His manager was Mike Spurlock and CEO Randy Smith.  He worked in Business Development as a Business Development Representative, then promoted to Business Development Director, and finally promoted to AVP of Business Development, which was the title he held until he was wrongfully terminated.

17.     As the Business Development Officer, Ynostrosa worked in Austin, San Antonio and Dallas markets helping the RB grow its Field of Membership (Consumer and Business) through member acquisition and member retention to include hiring up to sixteen Business Development Officers.

18.     From January 2005 to December 2014, Ynostrosa had no reprimands to his knowledge.

19.     In or around December 2014, Spurlock retired and Defendant Lyons as VP of Membership became Ynostrosa's new boss.  Ynostrosa continued to work at growing each of the respective markets under him, and from all indications was doing a good job.  In fact, in late 2017, Ynostrosa was selected by RB to join a Leadership Development Program because of his recognized

leadership abilities.  Ynostrosa appreciated this recognition and saw it as a path to even bigger and better opportunities to grow RB's business as well as his own career with RB.

20.     From January 2015 to May 2018, Ynostrosa worked very hard, but eventually toward the early 2018, started experiencing episodes of depression and anxiety.  This manifested itself in various ways, including significantly impairing his ability to sleep, focus, eat, and think clearly.

21.     Around this same time in early 2015, Ynostrosa's Director of Operations, Cassandra Garcia, had her company vehicle removed and was asked to report to the main office every day.  Prior to this, she had served Ynostrosa as his Director of Operations.  This staffing change left Ynostrosa unable to manage the Business Development Group effectively.  They never consulted Ynostrosa about this change; it just happened.

22.     Toward the end of May 2018, Ynostrosa sought medical treatment from his doctor, who diagnosed him with depression and anxiety, prescribed him medications to address those issues, and filled out FMLA paperwork because the doctor believed Ynostrosa needed to take medical leave to get better.

23.     From May 23 to late July 2018, Ynostrosa was on FMLA leave, though during his leave he was being constantly contacted about work issues, which he attempted to handle to the extent he could, but he was frustrated at RB's intentional interference with and unwillingness to respect his protected leave status and to accommodate him while he dealt with his disabled condition.

24.     Upon return from leave in late July, Ynostrosa could tell that he was being treated differently by various persons, including Defendant Lyons.  He believes this was because of his known health issues and his taking leave to deal with them.  This only exacerbated Ynostrosa's health troubles.

25.     For example, upon returning from FMLA in July, his company car was moved to Austin, which interfered with his ability to do his work effectively and efficiently.  When he asked Lyons about

the company car, Lyons got irritated and said, "Is that what you are going to complain about? Really?" Ynostrosa didn't want to be disrespectful, so he ended the conversation and went to his office. Regardless, this was one example of how he was not returned to the same position he occupied prior to taking his FMLA-protected leave.

26.     Another example: upon his return, an employee by the name of Glenn Errhalt, HR Director, would come to his office daily in the morning to converse with him, which was odd given that he had never had occasion to do this in the past.  This further interfered with Ynostrosa's ability to do his job, and was not a term or condition of employment that was imposed on other similarly situated employees like him with no history of having taken FMLA-protected leave, being disabled or being regarded as disabled.

27.     The situation became so uncomfortable that Ynostrosa needed to see a cardiologist on August 3, 2018 because he was experiencing numbness in his left arm.  He feared this could be the onset of a stroke.  The cardiologist believed it may require a neurologist to review; however, Ynostrosa was terminated before he could ever see a neurologist and cannot do so now for lack of insurance. Meanwhile, his treating physician believed Ynostrosa had depression brought on by a toxic work environment.

28.     On August 3, 2018, Ynostrosa traded emails with Amy Sargent, RB's HR Benefits Specialist III.  Ynostrosa told Sargent "I can return to work, however, I will need to maintain my doctor visits on Friday afternoons."  When Ynostrosa emailed Sargent again to confirm she received his doctor's note, she said "Yes sir, I did.  We will need it to be more specific. We'll need a release note from your doctor that releases you to return to work FT effective 8/6/18 (Monday-Thursday 8 hours per day and half days on Fridays for 2 months)."

29.     Shortly after this email exchange, Ynostrosa met with RB's HR officials Ashley Ingle and Barbara Daffon to specifically ask them for help with his return to work.  During this meeting, he addressed his tenure and all the progress and successes his team had achieved over the past almost fourteen years, showing that he was qualified to do the job he was given.  He addressed the fact that there were all types of rumors/gossiping/sound bites regarding his FMLA and reasons for not being at work.  He believed HR had poorly handled an investigation that had occurred in February of 2018 into allegations of favoritism against Ynostrosa, which ultimately resulted in no determination that he had done anything wrong.  Nevertheless, some of his supervisory duties had been removed, which had the "optics" that he had done something wrong.  Finally, he discussed the fact that he had not been given a pay raise yet despite his department having another stellar year that met goals.  Ultimately, Defendant Ingle and Daffon washed their hands of the situation and directed Ynostrosa to address each issue with his supervisor, Defendant Lyons.

30.     Roughly a week later, Ynostrosa met with Lyons.  While Lyons promised to help with staff development, he did not specifically address the reason why Ynostrosa had not been given a pay raise.  Instead, he said that the next few months would be very important in decided whether that would happen or not.  Ynostrosa believed then as he believes now that Lyons's decision to withhold a pay raise from him was to interfere with and retaliate against Ynostrosa in violation of his rights under the FMLA, as well as under the ADA.

31.     Following that meeting with Lyons, Ynostrosa learned that, contrary to his promises to help Ynostrosa with staff development, Lyons was actively trying to undermine Ynostrosa by getting Ynostrosa's colleagues to complain about Ynostrosa to HR.

32.     On Monday, September 17, 2018 at or around 4pm, Ynostrosa was asked by Lyons to come to his office.  When he arrived, Ingle was already there to attend the meeting on behalf of RB's

HR department.  Ynostrosa was told by them that the decision had been made to end Ynostrosa's employment with RB.  Lyons stated that he felt that Ynostrosa had not built enough trust with him and that a few of the staff members were looking for employment elsewhere because of Ynostrosa, though no further explanation or evidence was given.  Lyons and Ingle then both mentioned a host of other items that supposedly supported their decision to terminate Ynostrosa, though details were scarce to non-sensical, and regardless, completely at odds with Ynostrosa's actual employment history with RB.

33.    At the end of this September 17, 2018 meeting, Ynostrosa was told by Ingle that she was giving him a thirty-day period following the meeting in which to rebut the allegations they provided in support of the decision to terminate his employment.

34.    On September 23, 2018, Ynostrosa sent a detailed email outlining what was said during the meeting as to why he was being terminated and asking for further information given what he was told by Ingle about having a chance to rebut the allegations.  That email is attached at Exhibit 3 and incorporated by reference herein as if set forth *verbatim*.  Ex. 3, 20180923 Ynostrosa-Ingle Rebuttal Email.

35.    On September 25, 2018, while still thinking he would be given a chance to rebut the allegations against him, Ynostrosa received in the mail an unsigned, form termination letter dated September 19, 2018, informing him of his termination over nebulous reasons that lacked any specifics or evidence.  Ex. 4,  20180919 HR-Ynostrosa Term Ltr.

36.    Over the next weeks, Ynostrosa sent numerous emails to Ingle over the situation, which were basically ignored.  Ex. 5, 201809-11 Ynostrosa-Ingle Emails.  Ultimately, despite saying that he would be given a chance to rebut the allegations supporting his termination, Ingle did not keep her promise.

37.     On February 22, 2019, Ynostrosa filed his predicate charge with the EEOC, which is attached as an exhibit hereto and incorporated by reference herein as if set forth *verbatim*. Ex. 1, 20190222 Ynostrosa Charge.

38.     During the administrative process, RB filed a position statement through its attorneys that was full of second-hand information not backed by any documentation or sworn statements.  For instance, in the position statement:

a.  RB claimed Ynostrosa was counseled on May 2, 2018 regarding deficiencies with his work.  Ynostrosa claims that no counseling ever took place (verbal or otherwise).

b.  RB claimed that Ynostrosa's team struggled under his leadership.  This was never mentioned to him.  In February, Ynostrosa had met with Jeff Peckham and Lyons regarding an anonymous complaint that Ynostrosa had been favoring some employees.  At that time, Peckham stated that RB doesn't take these claims seriously and that there was no need for alarm because of its anonymous nature of the complaint and lack of corroboration.  Ynostrosa asked if he was being counseled in anyway and was told that he was <u>not</u> being counseled but instead it was thought it would be in Ynostrosa's interest to know about the situation.

c.  RB claimed that Lyons had no knowledge of Ynostrosa's medical condition; however, on at least one occasion, Ynostrosa knows for a fact that he had called and told Lyons that he was experiencing some pain in his arm and needed to see his doctor.  He told Lyons that he would not be in the office the rest of the day and would let Lyons know of his prognosis. Once examined by his doctor, his doctor wanted Ynostrosa to see a cardiologist and not return to work until getting results and seeing his doctor thereafter.  After seeing the cardiologist and his doctor, he asked to return to work by

easing his way back and provided HR with the appropriate documentation.  He did get permission to return to work from HR to attend a one-day session, which was part of the Leadership Training Program.

d.   RB claimed that problems persisted after his return from FMLA leave; however, such complaints or concerns were never brought to his attention.  To the contrary, it was Ynostrosa's understanding that Lyons was actively encouraging Ynostrosa's colleagues to complain about Ynostrosa to HR, while keeping Ynostrosa in the dark about such complaints.

e.   RB claimed that Ynostrosa had abused use of his RBFCU corporate cards by placing unauthorized charges for roughly $18 in gas; however, it was customary when a mistake like this occurred for employees to submit a transfer slip to clear the matter up.  The accounting department would do this for all employees.  In Ynostrosa's experience, it was the first time in thirteen years that something like this had happened, while some employees did this regularly and sometimes for higher amounts.

f.   RB claimed that Ynostrosa failed to include Blake Lyons in trust huddles, but he was told by the HR Learning and Development Team to not include members of management as this was a department exercise and no other departments were being required to do this.  Trust huddles started in late August, which was at least 4 weeks after his return.  To Ynostrosa's recollection, he actually invited Lyons to all of his first three huddles.  As to the second huddle, Lyons claimed he did not receive the email invite.  But Lyons was at the first meeting when they discussed when the follow-up meeting would take place.  And Lyons sent Ynostrosa an email indicating that, while he would like to be invited to subsequent meetings, he made it clear that he may

not be able to attend all of the meetings.  Regardless, there was ample time to let Ynostrosa know if there were any problems with him failing to include Lyons or anyone else for that matter.  Of course, during this time, Lyons knew about Ynostrosa's personal situation as they had had several discussions about his health and medical leave issues by this point.

g. RB claimed that Ynostrosa failed to follow procedures for sponsorships, but it was customary for Business Development to attend events and represent the Credit Union, while payment was pending.  As a matter of fact, Lyons allowed invoices to pile up in the online OnBase queuing system so much that the Finance Team would make comments about it and so would Mary O'Rourke, the Executive Vice President. It was a running joke at how long Lyons would take to approve these requests. On numerous occasions, employees (Ynostrosa included) would confirm via email with the Finance Department if sponsorship requests had been approved by Lyons and they would, in fact, be pending.

## LEGAL CLAIMS

39.    The foregoing paragraphs are incorporated by reference as if set forth *verbatim* as to all legal claims listed below.

### ADA Discrimination and Retaliation Claims
### (Against Defendant RB only)

40.    As described in the factual section above, Defendant's actions constitute unlawful discrimination on the basis of Ynostrosa's disabilities in violation of the Americans with Disabilities Act Amendments Act of 2008, 42 U.S.C. § 12101, *et seq*.  The employment practices complained of above were intentional.

41.     The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be protected from being discriminated against on account of a disability or being regarded as disability.

42.     While a disability was originally defined under the ADA as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability, these terms were redefined in 2009 to make it easier to be covered under the amended law.

43.     Notably, the limitations from the impairment no longer have to be severe or significant for the impairment to be considered substantially limiting.

44.     In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), "major life activities" include the operation of major bodily functions, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.  Only one major life activity need be substantially limited.

45.     Moreover, an impairment that is "episodic" (*e.g.*, epilepsy, depression, multiple sclerosis) or "in remission" (*e.g.*, cancer) is a disability if it would be substantially limiting when active.  An impairment may be substantially limiting even though it lasts or is expected to last fewer than six months.

46.     As to "regarded as" coverage, an individual can meet the definition of disability if an employment action was taken because of an actual or perceived impairment (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).  "Regarded

as" coverage under the ADAAA does not require that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.

47.    RB was at all times relevant an employer as defined under the ADA.

48.    Ynostrosa was intentionally treated, including being disciplined and ultimately terminated, differently in the terms and conditions of his employment than other non-disabled (or non-regarded-as-disabled) co-workers.  Such treatment constituted both discrimination and retaliation by RB in violation of the ADA.

49.    Ynostrosa was and is a qualified individual with an actual disability as defined by the ADA of which RB's agents were aware, including Defendants Lyons and Ingle.

50.    In addition or in the alternative, Ynostrosa was and is a qualified individual with a history of having a substantially limiting impairment, of which RB's agents were aware, including Defendants Lyons and Ingle.

51.    In addition or in the alternative, Ynostrosa was and is a qualified individual regarded as having a disability by RB's agents, including Defendants Lyons and Ingle.

52.    Ynostrosa's physical and mental disabilities interfered with major life activities including thinking, concentrating, sleeping, and normal functioning of his body (*e.g.*, cardiovascular) given the stress and depressive conditions for which he sought and received medical attention and medical leave under RB's leave policies, including its FMLA policy.

53.    Ynostrosa at all times remained capable of performing the essential functions of his job, though he needed some reasonable accommodations at certain points during his tenure.

54.    The circumstances of his wrongful termination, such as the temporal proximity of his termination to his taking FMLA leave and asking RB agents for help in transitioning back from such leave, raise an inference of discrimination and retaliation.  Indeed, at various points throughout the

months leading up to his termination, RB failed to engage in the interactive process with Ynostrosa, and thereby denied him reasonable accommodation for his covered condition.

55.     RB violated Ynostrosa's ADA rights (not to mention FMLA rights) by denying Ynostrosa's requests for additional leave as a reasonable accommodation.

56.     RB violated Ynostrosa's ADA rights by intentionally discriminating against Ynostrosa because of his disabilities and/or perceived disabilities, by treating Ynostrosa in a discriminatory manner compared with her non-disabled peers, by disciplining and ultimately terminating Ynostrosa for pretextual reasons, and by not giving him an effective chance to rebut such allegations despite being told he would be given such an opportunity to do so.  Indeed, they issued a form termination letter only a few days into the 30-day rebuttal period he had been promised.

57.     Defendant also violated Ynostrosa's ADA rights by retaliating against Ynostrosa for complaining about disability discrimination and for requesting reasonable accommodations.

58.     Ynostrosa's disabilities and Ynostrosa's complaints about disability discrimination were a motivating factor in Defendant's decision to terminate Ynostrosa's employment, including not giving Ynostrosa the opportunity to rebut the allegations that were the purported reasons why Ynostrosa was terminated.

59.     Defendant acted intentionally and with reckless disregard for Ynostrosa's ADA rights, and persisted in committing acts of disability discrimination despite Ynostrosa's numerous complaints and pleas for relief from Defendant's conduct.

60.     Due to Defendant's violation of Ynostrosa's ADA rights, Ynostrosa lost his job, his wages, and his fringe benefits and the opportunity to continue to work for RB.

61.     Ynostrosa respectfully asks the Court and the jury to award him all of the relief to which he is entitled, including reinstatement or front pay, back pay, all of his other actual damages,

compensatory damages for mental anguish and emotional distress, and attorney's fees, costs and pre- and post-judgment interest as appropriate.

## FMLA Interference
## (Against All Defendants)

62.    RB is an employer subject to the requirements of the FMLA under 29 U.S.C. § 2611(4)(a)(i).

63.    Lyons and Ingles are also employers subject to the requirements of the FMLA under 29 U.S.C. § 2611(4)(a)(ii) because both acted directly or indirectly in the interest of RB as to Ynostrosa's employment. *See Modica v. Taylor*, 465 F.3d 174 (5th Cir. 2006).

64.    Defendants    interfered    with    Ynostrosa's FMLA rights under 29    U.S.C. 2615(a)(l) by interfering with his leave by calling him during such leave, by penalizing and disciplining Ynostrosa because Ynostrosa requested and ultimately took FMLA leave, by failing to return Ynostrosa to his same job position following his return from FMLA leave, and by terminating Ynostrosa to prevent Ynostrosa from continuing to use leave, including FMLA leave, still available to him.

65.    As a result of Defendants' interference with Ynostrosa's FMLA rights, Ynostrosa lost his job, his wages, and his fringe benefits.

66.    Defendants acted in bad faith, without reasonable grounds for believing their conduct was lawful, and persisted in interfering with Ynostrosa's FMLA rights despite Ynostrosa's multiple complaints and pleas for relief from Defendants' interference.

67.    Ynostrosa respectfully asks the Court and the jury to award him all relief to which he is entitled, including reinstatement or front pay, back pay, all of his other actual damages, liquidated damages and attorney's fees, costs and prejudgment interest.

### FMLA Discrimination
### (Against All Defendants)

68.     Defendants discriminated and retaliated against Ynostrosa in violation of 29 U.S.C. §2615(a)(2) by disciplining Ynostrosa and terminating Ynostrosa for exercising his right to take medical leaves of absences authorized by the FMLA.

69.     As a result of Defendants' discrimination and retaliation, Ynostrosa lost his job, his wages and fringe benefits.

70.     Defendants acted in bad faith, without reasonable grounds for believing their conduct was lawful, and persisted in discriminating against Ynostrosa for exercising his FMLA rights despite Ynostrosa's multiple complaints and pleas for relief from Defendants' discriminatory conduct.

71.     Ynostrosa respectfully asks the Court and the jury to award him all relief to which he is entitled, including reinstatement or front pay, back pay, all of her other actual damages, liquidated damages and attorney's fees, costs and prejudgment interest.

## ATTORNEY'S FEES

72.     Ynostrosa had to retain the services of the undersigned attorney to prosecute this action. Plaintiff is entitled to recover the reasonable and necessary attorneys' fees, expert fees and court costs to prosecute this action as authorized under the federal causes of action listed above.

## JURY DEMAND

73.     Plaintiff hereby requests a jury trial of this lawsuit and tenders payment for same.

## PRAYER FOR RELIEF

74.     Ynostrosa respectfully prays that Defendants be summoned to appear and that after summary and/or jury trial disposition that they be held liable, jointly and severally (as appropriate) for

the violations complained of above, and that Ynostrosa ultimately receive the greatest award recoverable, including his:

    a.  if possible, reinstatement with protections against further violations of his rights;

    b.  injunctive relief to the extent equitably necessary to remedy and prevent actions taken against Ynostrosa following his termination that have harmed his job prospects;

    c.  back pay;

    d.  front pay;

    e.  other pecuniary losses, such as promotional opportunities, raises, bonuses and job status;

    f.  lost benefits, including lost vacation, value of lost insurance, and lost investment benefits because he was forced to pull money out of his investment;

    g.  past mental anguish,

    h.  future mental anguish,

    i.  attorneys' fees,

    j.  costs of court,

    k.  expert fees,

    l.  and statutory and/or liquidated and/or exemplary and/or punitive damages for Defendants' willful violation of the statutes pled herein;

    m.  his pre-judgment and post-judgment interest as allowed by law;

    n.  all such other relief to which he may be entitled, whether it be at law, or in equity, general or special.

Respectfully submitted,

_____
DAVID M. EVANS
State Bar of Texas No. 24032163
750 East Mulberry, Suite 900
San Antonio, Texas 78212
210.880.4606 (direct)
210.800.9876 (fax)
david@dmeacl.com